NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In the Matter of                  :          Case No. 12-32781/JHW

Mount Olive Hospitality, LLC      :

                                             **<u>OPINION</u>**

Debtor.                           :
_____

APPEARANCES:    Daniel P. Bernstein, Esq.
                John Calzaretto, Esq.
                Calzaretto & Bernstein, LLC
                459 Route 38 West
                Maple Shade, NJ 08052
                Counsel for the Debtor

                Peter C. Hughes, Esq.
                Lawrence McMichael, Esq.
                Dilworth Paxson LLP
                1500 Market Street, Suite 3500E
                Philadelphia, PA 19102
                Counsel for Northstar Mt. Olive LLC

                Mark D. Pfeiffer, Esq.
                Buchanan Ingersoll
                50 South 16th Street
                Suite 3200
                Philadelphia, PA 19102
                Counsel for VWI Properties, LLC

                Joseph Vaccaro, Esq.
                5908 Torresdale Avenue
                Philadelphia, PA 19135
                Counsel for Ashwin Patel et al.

                Shining J. Hsu, Esq.
                Office of the US Trustee
                US Department of Justice
                One Newark Center - Suite 2100
                Newark, NJ 07102
                Counsel for the UST

**FILED**

JAMES J. WALDRON, CLERK

May 16, 2014

U.S. BANKRUPTCY COURT
CAMDEN, NJ

BY: s/ Theresa O'Brien, Judicial
Assistant to Judge Wizmur

Before the court for resolution are several motions and objections filed by VWI Properties, LLC, the prepetition purchaser of the secured debt associated with the debtor's hotel property.  In the debtor's schedules, the debtor listed several unsecured claims allegedly held by various promissory note holders totaling over four million dollars.  VWI challenges the validity of those claims on several grounds, and seeks to recharacterize the claims as equity contributions rather than as debt.  VWI also contends that the note holders are all insiders of the debtor and thus are ineligible to vote on the confirmation of the debtor's proposed Chapter 11 plan.  As well, VWI seeks leave to file avoidance actions on behalf of the bankruptcy estate and seeks leave to object to the inclusion of hotel trade debt as claims against the bankruptcy estate.[1]

For the reasons expressed below, VWI's objections to the various promissory notes and challenge to the insider status of the various claimants is granted in part and denied in part.  VWI's motion for authority to challenge the inclusion of the trade debt in the debtor's schedules is granted.

---

[1]      VWI's pending motion seeking leave to file avoidance actions on behalf of the bankruptcy estate was not addressed, and the motion will be left for subsequent resolution.

## FACTS AND PROCEDURAL HISTORY

I.  Prepetition History.


The debtor, Mount Olive Hospitality, LLC (hereinafter "Mount Olive"), was

formed as a vehicle for hotel property ownership on or about December 17,

2007.  Anil Patel and Manish Patel are the two major principals of the

company, each presently holding approximately a 37.5% interest in the debtor.

Mount Olive is affiliated with the Northstar Group, a group of entities

principally owned and controlled by Anil and Manish,[2] which owns and

operates several hotels.  In general, the corporate structure is set up so that

the physical assets of each hotel are owned by a separate company, while the

operations of each hotel are conducted by an "independent" management

company.  The Northstar Group also includes Am Star Hospitality, LLC,

(hereinafter "Am Star") an entity owned equally by Anil and Manish that acts as

a common fund for the other Northstar Group entities.


On January 18, 2008, Mount Olive acquired a 141 room full service hotel

located at 1000 International Drive, Budd Lake, New Jersey.  The acquisition

was financed by a first mortgage loan between the debtor, Northstar Mount

---

[2]       Because so many of the parties involved in this case have "Patel" as their surname, I
will often refer to parties by only their first name.

Olive LLC, the debtor's former management company, and Roma Bank.[3]  The

debtor borrowed $6,375,000 for the acquisition, and an additional $1,000,000

for renovations.  The terms of the loan required the debtor to establish an

initial equity investment of approximately $2.4 million dollars, and prohibited

the debtor from incurring any junior indebtedness other than normal trade

debt without the bank's consent.

After struggling to operate as a Wyndham Garden Hotel, Mount Olive

elected to convert the property to a Holiday Inn franchise.  On March 17, 2010,

Northstar ITCA Management, LLC, the successor to Northstar Mount Olive,

LLC, as the management company for the debtor, acquired a Holiday Inn

franchise.  Northstar ITCA is owned entirely by Anil and Manish.  As a

condition of the acquisition, the franchisor, Intercontinental Hotel Group

("IHG"), required the franchisee to enter into lease and management

agreements with Mount Olive to manage and operate the property.

Under the Management Agreement between Mount Olive and Northstar

ITCA, Northstar ITCA agreed to operate the hotel property for a term of 5 years,

with automatic renewals each year, absent objection.[4]  The Agreement recited

incorrectly that the Holiday Inn franchise would be held by the debtor, when in

fact the franchise was held in the name of Northstar ITCA.  The management

---

[3]     Northstar Mount Olive, LLC, the management company formed to operate the hotel, was
included on the note but not on the mortgage or the assignment of rents.  Anil Patel signed for
both entities.
[4]     Exh. 94 Management Agreement at 2.

company was retained as an independent contractor,[5] and the agreement provided for a monthly management fee of 4% of the gross revenues generated by the property.[6]  Under the agreement, all debts and liabilities to third parties incurred by the manager operating under the agreement were to be treated as debts and liabilities of Mount Olive.[7]  Notwithstanding this contractual provision, in practice, all of the trade debt and operating expenses incurred by Northstar ITCA were actually recorded on Northstar ITCA's books, records and tax returns.  None of the trade debt was noted in the books, records and tax returns of the debtor until after the bankruptcy petition was filed.

Pursuant to the Lease Agreement, Northstar ITCA agreed to pay an annual rental fee of $1,200 to Mount Olive.[8]  The lease required that the lessee pay all expenses related to the property, including repairs, maintenance, real estate taxes, and utility charges.[9]  The lease afforded the lessee the full right to "make any alterations, additions or improvements to the Leased Premises and buildings," and any such changes, to the extent that they were not permanently attached to the property, remained the property of the lessee, Northstar ITCA.[10]  The lease agreement expressly stated that the lessee was not an agent of the lessor.[11]

---

[5]   Id. at 4.
[6]   Id. at 12-13.
[7]   Id. at 9.
[8]   Exh. 93 Lease Agreement at 4.
[9]   Id. at 4-5.
[10]  Id. at 26, 36-37.
[11]  Id. at 30.

As a further requirement of the franchise acquisition, the franchisee had to implement a Property Improvement Plan ("PIP"), at an estimated cost of $1 million, to renovate the property in accordance with Holiday Inn guidelines. To attempt to fund these improvements, the debtor modified its loan agreement with Roma Bank, on May 28, 2010, changing the payment terms and interest rate, and entered into a second mortgage agreement and note with Roma Bank in the amount of $280,900, on the same day.

On or about March 3, 2011, Mount Olive defaulted on the mortgage payments. On May 26, 2011, Roma commenced a foreclosure action in the New Jersey Superior Court. On or about June 29, 2011, the parties entered into a consensual agreement to appoint BUNJ Associates, LLC as a receiver for the hotel property. As a consequence of the appointment of a rent receiver, Holiday Inn terminated the debtor's franchise agreement by letter dated July 22, 2011, to be effective on September 26, 2011. Prior to the termination, the rent receiver entered into a revised franchise agreement with the Holiday Inn franchisor to enable the franchise to continue.

A final judgment of foreclosure was entered on December 6, 2011. The sheriff's sale was stayed pending appeal. Oral argument on the appeal was scheduled for September 20, 2012. In the interim, on June 29, 2012, Roma sold the underlying loan and assigned its final judgment to VWI Properties, LLC (hereinafter "VWI").

6

II.    <u>Funding of Northstar Group Entities and the Debtor</u>.


As noted above, the debtor is affiliated with Am Star, an entity owned equally by Anil and Manish, which serves as a clearing house for funds for the Northstar Group entities.  Am Star's revenue sources include management fees received from the various management companies operating hotels within the group, and investments and loans made by third party individuals to Am Star, to particular hotels, or to Anil and Manish.  The funds in Am Star are used as needed interchangeably among the Northstar Group hotels and management companies.  As well, Am Star funds are also used to pay certain expenses of the principals, including credit card bills and car payments.


Anil and Manish have been prominent hoteliers for many years, and have routinely been successful in raising money for their myriad hotel operations, either as loans or as equity in specific projects.  Typically, funds are received from close family and friends, and a wide network of business associates, many of them also of Indian ethnicity and involved in the hotel industry.  Anil and Manish are both respected members of the Asian American Hotel Owners Association ("AAHOA"), a national organization representing the hotel industry, and Anil has been an elected officer of that organization.  It has been customary for members of AAHOA, as well as members of certain other organizations that Anil and Manish belong to, including the Delaware Business Association and the Wednesday Club, to lend and invest in each other's

7

projects.  In these transactions, the critical component of the deal is the stellar

business reputation of the principals, which engenders a degree of trust that

reduces the need for formalities.  There is usually little or no due diligence

done by the lender or investor, no legal assistance involved, and very little

information exchanged about the particulars of the project to be funded.  Such

is the nature of the funding that was received by the entities of the Northstar

Group, including the debtor.

Anil and Manish became interested in purchasing the Mount Olive

property in the fall of 2007.  In October 2007, months before the debtor was

formed in December 2007 as an LLC, Anil and Manish obtained $400,000 in

funding from Rajesh Patel.  The money was deposited into the Am Star

account, and, except for $10,000 used in connection with the Mount Olive

acquisition, was spent down for the benefit of other entities, to about $25,000

by mid-December 2007.  The debtor asserts that the advance from Rajesh was

a loan to the debtor in connection with the acquisition of the property.  The

advance was documented by a promissory note from the debtor dated January

1, 2008.

To fund the acquisition of the hotel property and to meet the

requirements of Roma Bank with respect to its debt to equity ratio, the debtor

was required to show $2.4 million in equity contributions.  In fact, $750,000

was actually infused as an equity contribution to the debtor.[12]  The remaining

$1,650,000 was originally recorded as Am Star equity on the debtor's General

Ledger,[13] and included the contributions of several of the claimants herein,

including Tushar Patel ($250,000 on January 3, 2008), Mehul Patel ($400,000

on January 8, 2008) and Mayank Patel ($250,000 on January 31, 2008).

Notwithstanding the original designation of the funding from Tushar, Mehul

and Mayank as Am Star equity which was also noted as Am Star equity on the

debtor's books, promissory notes reflecting each of these advances were

drafted.  If the three claimants had been treated as liabilities on the debtor's

books, the debtor would not have met the requisite level of equity specified by

Roma Bank for the closing.


On December 31, 2008, through accounting adjustments in the debtor's

QuickBooks file, the $1.65 million, which had theretofore been recorded on

debtor's books as Am Star equity, was credited to the capital accounts of Anil

Patel ($800,000), Manish Patel ($800,000), Nilesh Patwa ($25,000) and Alpesh

Patel ($25,000).  Yet the contributions of Tushar, Mehul and Mayank were not

noted as liabilities on the debtor's books, or in the debtor's tax returns for

2008.[14]  In fact, the funds from these claimants actually became part of the

equity of Anil, Manish, Alpesh and Nilesh Patwa.  The status of these advances

as equity contributions was confirmed by Anil in a letter to the president of

---

[12]    See Exh. 41 – 2008 Tax Return.
[13]    See Expert Report of Allen Wilen, Exh. 10 – Mount Olive Hospitality General Ledger.
[14]    See Exh. 41.

Roma Bank seeking additional financing dated April 8, 2011, in which he represents that $2.4 million of equity had been infused into the debtor.[15]  Now, the debtor, through its principals, seeks to change its position and assert that those claims were actually loans to the debtor.

Following the original capitalization of the debtor, Anil and Manish continued to seek funding for or on behalf of the debtor.  The debtor's tax returns for 2008 and 2009 show no income,[16] while the returns for 2010 and 2011 show "Residual Income From Hotel" of $225,000 and $168,000, respectively.  The hotel enterprise needed funds both for renovations and for operations, and funds continued to be advanced by various parties, most of whom are the claimants herein.  Funds were advanced even through the lengthy period during which the debtor was in receivership, from July 2011 through the filing in September 2012.  None of the funds advanced by the claimants were listed as liabilities on debtor's books or tax returns.

The operational income and expenses of the debtor's hotel are all run through Northstar ITCA.  The hotel employees are employees of Northstar ITCA, which owns the hotel franchise, holds the hotel's liquor license and has a lease for the use of the debtor's physical premises.  Vendors providing supplies to the hotel are paid either through Northstar ITCA or through the Northstar corporate offices.  The debtor pays some of its own expenses associated with

---

[15]     See Expert Report of Allen Wilen, Exh. 12.
[16]     See Exh. 41 and 42.

the real estate, such as taxes and insurance, while Northstar ITCA also pays

some real estate related-expenses directly to third parties.[17]

It was only after the bankruptcy filing that the debtor began to show

operational income and expenses on its monthly operating reports.  Pre-

petition trade payables were first noted on the debtor's books, in lump sum, in

early October 2013, over a year after the filing.

Except for the monies advanced by Tushar, Mayank and Mehul, which

were initially deposited in the debtor's account and then immediately

withdrawn, all of the other monies that the debtor seeks herein to designate as

loans to the debtor were deposited into Am Star's account.  All of the monies

received were initially treated as Am Star equity on Am Star's books.  None of

the monies received were treated as liabilities on either the books of the debtor,

Am Star, or Northstar ITCA.  Nor did these claims appear as liabilities charged

to the debtor on the debtor's tax returns from 2007 through 2011.

It was not until October 25, 2013, over a year after the filing, that the

debtor's records were altered to insert the claims challenged by VWI as

liabilities of the debtor.  The adjustments in the debtor's records were made

around the time that the debtor's 2012 tax returns were being completed, and

around the time that VWI's forensic accounting expert, Allen Wilen, was

---

[17]    The debtor was determined to be a Single Asset Real Estate case on April 16, 2014.  See
11 U.S.C. § 101(51B).  See also T5 through 12 (4/16/14).

seeking information and preparing his report about those liabilities in anticipation of the commencement of hearings on VWI's objection to claims. The entries in the debtor's QuickBooks to add the claims, while actually made on October 25, 2013, were dated on the books as of January 1, 2012. In effect, the entries were back-dated by a year and a half. The offsetting debit entries are for Am Star claims and a reduction in the equity of Anil and Manish. None of the entries for the claims show an entry for interest accrued on each note. The debtor contends that the failure to note these debts as liabilities was an error that was corrected on October 23, 2013.

As noted, the funds received from the various claimants in this case were deposited into the Am Star account, and used by the various Northstar Group entities as needed. The debtor asserts that all of the funds received on behalf of the debtor were actually used for the benefit of the debtor, and that the debtor actually received about $95,000 more in funds from Am Star, designated as "member advances", than was deposited with Am Star on its behalf.[18] To some extent, VWI successfully challenged this proposition by highlighting that Am Star advances were often made to the operating entity of the hotel, Northstar ITCA, rather than directly to the debtor. While one might argue that such advances ultimately benefitted the debtor, Northstar ITCA, if deemed an independent contractor rather than an agent of the debtor, might have been the direct beneficiary of the funds. As well, legitimate questions

---

[18]   See Exh. MO-3.

were raised about specific Am Star advances, and whether they benefited the

debtor at all, including a $10,000 fee paid to Dilworth Paxson LLP, the firm

representing the Northstar Group during this bankruptcy case, and various

expenditures made by Am Star, ostensibly for the benefit of the debtor, during

the receivership, which were largely unexplained.


III.    Bankruptcy Procedural History.


On September 17, 2012, shortly before oral argument was scheduled to

be heard on the appeal of the judgment of foreclosure, Mount Olive Hospitality,

LLC filed a voluntary petition under Chapter 11 of Bankruptcy Code.  The

debtor listed over $4.0 million in unsecured debt, including, as is significant

here, claims held by Ashwin Patel ($547,055.29), Kanan Patel ($600,804.03),

Mayank Patel ($436,941.17), Mehul Patel ($703,892.44), Prakash Patel

($63,850.49), Rajesh Patel ($832,446,37), Rambhai Patel ($336,125.35),

Tushar Patel ($638,339.68), and Amit Shah ($175,611.24).  The debtor later

amended its Schedule F, revising upward the amounts of all of the previously

listed note holder claims and adding the claims of Jigar Patel, Inc.

($26,294.52), Shiv Sanwal ($133,069.03), James Deringor aka Gungor James

Deringor or James Gungor ($220,177.69),[19] Palash Gupta ($148,186.30) and

Pravin Modi ($70,616.57).  All of the claims were listed as undisputed.  Only

four of these alleged note holders, Jigar Patel, Jim Gungor, Palash Gupta and

---

[19]    This claimant goes by several names, but will be referred to as Jim Gungor in this
opinion.

Pravin Modi filed proofs of claim with the court, and all four were filed over 8 months after the claims bar date.

VWI moved on September 19, 2012 to allow the rent receiver (identified as GF Management, LLC in the papers) to remain in possession of the hotel property.  VWI's motion was denied, and an order was entered on November 8, 2012, returning operational control to the debtor on November 14, 2012.

On May 14, 2013, VWI filed a motion to determine the insider status of various claimants for plan voting purposes.  VWI challenged the status of eight of the nine major unsecured creditors listed in the debtor's schedules (Prakash Patel was excepted), asserting that the individuals were all close family and business relations that would qualify as insiders for purposes of 11 U.S.C. § 101(31).  VWI followed with separate objections to the claims filed by Amit Shah, Rambhai Patel and Ashwin Patel.  In September, 2013, VWI filed objections to five additional claimants (Rajesh, Kanan, Mehul, Tushar, and Mayank Patel).  An opportunity for discovery on the issues raised by VWI was afforded, and hearings on the motion and objections commenced on November 8, 2013.  The hearings were stayed for several months while the parties engaged in mediation, but reconvened in March 2014, following the failure of settlement discussions.  In the meantime, additional objections were filed by VWI to the claims of Pravin Modi, Palash Gupta, Jim Gungor, Shiv Sanwal, Jigar Patel, Inc., and Prakash Patel.

Throughout these proceedings, the debtor has supported the claims of all of the unsecured creditors listed on its schedules.  The debtor's latest plan contemplates the conversion of debt to equity.[20]  The plan proposes to fix the secured claim of VWI at $6.1 million, the highest amount advanced as the value of the collateral by VWI, thereby minimizing the VWI deficiency claim, which is classified with the other unsecured claimants.  If all of the claims of the non-VWI unsecured claims are sustained, and the claimants are not designated as insiders, then the voting may be sufficient to establish the consent of the unsecured creditor class.  See 11 U.S.C. § 1129(a)(8).  If the debtor's plan is confirmed, the debtor's management company, Northstar ITCA, would remain in place to continue to operate the hotel, with corresponding management fees to be earned, until and unless the new equity, the majority of which would now be held by those with close ties to Anil and Manish, would replace Northstar ITCA, an unlikely occurrence under these circumstances.

Hearings were held on November 8, 2013, March 31, 2014, April 3, 7, and 9, 2014 and concluded on April 28, 2014.

## DISCUSSION

To be discussed first are VWI's objections to the various claims, followed by consideration of VWI's motion to designate various claimants as insiders

---

[20]    The debtor filed a Third Modified Chapter 11 Reorganization Plan on August 23, 2013.

under 11 U.S.C. § 101(31), and VWI's motion for leave to challenge the trade
payable claims.


I.      Objection to Claims.


As noted, only four of the challenged claimants actually filed a proof of
claim and all four claims were filed after the bar date set for filing claims.
However, in the Chapter 11 context, Rule 3003(b) provides that the debtor's
Schedule F "shall constitute prima facie evidence of the validity and amount of
the claims of creditors, unless they are scheduled as disputed, contingent, or
unliquidated." Fed.R.Bankr.P. 3003(b). See also In re Hooker Investments,
Inc., 937 F.2d 833, 835 (2d Cir. 1991); In re Llennoc Real Estate, LLC, 460
B.R. 801, 804 (D.Utah 2011) (presumption of validity properly attaches to claim
included in the debtor's schedules); In re Merit Group, Inc., 464 B.R. 240, 252
(Bankr. D.S.C. 2011). None of the claims at issue were listed on Schedule F as
disputed, contingent or unliquidated. Accordingly, each claim is afforded
prima facie validity.


Once a claim is afforded prima facie validity, "the burden shifts to the
objector to produce sufficient evidence to negate the prima facie validity of the
filed claim." In re Lampe, 665 F.3d 506, 514 (3d Cir. 2011). If the objector
meets this burden, the burden shifts back to the claimant to establish the
validity of its claim by a preponderance of the evidence. Id. "[T]he claimant

16

always has the burden of persuasion in a contested proceeding." Id. (citing to

In re Allegheny Int'l, Inc., 954 F.2d 167, 173–74 (3d Cir. 1992)).

In reviewing the validity of the claims, we will first examine the

allegations of VWI regarding irregularities with the promissory notes purporting

to evidence the claims. We will then discuss the criteria for recharacterization

of debt to equity. Finally, we will examine each individual claim to determine

whether the objection has produced sufficient evidence to negate the prima

facie validity of the claim, and, if so, to determine whether the claimant has

established the validity of his or her claim by a preponderance of the evidence.

    A.    Irregularities with the Promissory Notes.

VWI filed claims objections to the following claims:

| Claimant | Amount | Date(s) of Transactions |
|----------|--------|-------------------------|
| Rajesh Patel | $865,013.36 | 1/1/08 10/31/09 |
| Mehul Patel | $700,777.32 | 1/8/08 |
| Kanan Patel | $652,476.93 | 1/29/08 |
| Mayank Patel | $452,276.23 | 1/31/08 |
| Tushar Patel | $661,622.64 | 1/3/08 5/28/10 |
| Prakesh Patel | $62,324.47 | 4/1/10 |
| Rambhai Patel | $286,290.41 | 6/27/12 |

| Amit Shah | $175,611.24 | 4/20/09 |
|---|---|---|
| Jigar Patel, Inc. | $26,294.52 | 3/12/12 |
| Shiv Sanwal | $133,069.03 | 4/26/10 |
| Jim Gungor | $220,177.69 | 4/1/10<br>5/9/11 |
| Palash Gupta | $148,186.30 | 10/24/11 |
| Pravin Modi | $90,616.57 | 2/6/09 |

Each claim is substantiated by a promissory note executed by Anil. Most of them are executed on behalf of the debtor, but a few notes are executed by Anil and Manish as individuals. While each claim will be reviewed independently, certain aspects of the promissory notes given by the debtor established during the hearings apply to some or all of the claims. These evidentiary showings defeat the legitimacy of most of the promissory notes presented. The evidentiary demonstration by VWI regarding the preparation of certain of the promissory notes at issue conclusively establishes that those notes must be completely disregarded as substantiation for the claims for which they are submitted, because the circumstances of their preparation are so implausible that the version offered by the debtor cannot be believed.

Nilesh Patwa, the controller for the Northstar Group entities since 2012, is the person who prepared the promissory notes at issue here.[21]  Nilesh can be described as a "tech guy".  He has a degree in electrical engineering, has been working with computers since around 1990, has been engaged since 2004 in installing wireless internet in all of the Northstar properties, and has been involved in the operational work of the Northstar Group entities since 2005.

Before the acquisition of the Mount Olive property, around 2006 or 2007, at Anil's instruction, Nilesh prepared a compact disc "("CD")" on which he included, among other forms, two templates for promissory notes.[22]  The CD was kept in Anil's desk.  Whenever Anil requested that a promissory note be prepared, Nilesh would retrieve the CD from Anil's desk, would insert the CD in his computer, and would manually fill in the information provided by Anil for that particular note, including the name and address of the grantor, the name and address of the grantee, the amount of the loan, the interest rate and the payment terms.  Anil would decide which template of the two on the CD would be used.  After he filled in the blanks on the template, Nilesh would not save the document, but would print out the document for Anil to review and

---

[21]    Anil may have prepared one of the notes, with Nilesh's help, but the note that might have been prepared by Anil was not identified.  In any event, if such a note was prepared, it was done in the same manner as the other notes.

[22]    According to Allen Wilen, VWI's forensic accountant, the first template appears to have been created on August 21, 2006, shows nominal editing time since then (10 minutes), and was last printed out in blank form on the day it was created.  The second template was created on December 7, 2007, shows nominal editing time (15 minutes) and was last printed on December 20, 2007.

execute.  Each time a promissory note was prepared, Nilesh testified that he

would repeat this process, never saving any of the documents on his computer.

The significance of Nilesh's testimony that he did not save any of the

promissory notes on his computer after he prepared them is that it is not

possible to discern from the metadata[23] associated with the preparation of the

promissory notes when the notes were actually prepared.  The notes in

question appear on their face to have been prepared intermittently over the

course of four years, from 2008 to 2012.  However, the irregularities in the

body of the notes highlighted by VWI leads to the inescapable conclusion that

Nilesh's testimony that he did not save any of the documents prepared cannot

be believed, because certain groups of notes have identical and glaring errors.

Other groups of notes, which all required manual input, are identical in ways

that would have been highly unlikely to be reproduced each time a form was

prepared.

The first group of promissory notes all display the following identical

errors.  These notes include the promissory notes given to Praven Modi,[24]

Chhotalal Chitalia, a person who is not a claimant in this proceeding but

appears to have been paid back prior to the filing,[25] Amit Shah,[26] Jim

---

[23]    Metadata was described by Allen Wilen, VWI's expert forensic accountant, as an audit trail
within computerized entries that allows review of who made an entry and when an entry was
made.
[24]    Exh. 16.
[25]    Exh. 17.
[26]    Exh. 18.

Gungor,[27] Palash Gupta,[28] and Jigar Patel, Inc.[29]   The first error was
committed in recording the name of the debtor.  When Nilesh typed out the
debtor's name, Mt. Olive Hospitality, LLC, each time, he capitalized the word
"HOSPITALITY".  The next errors were committed in recording the street
address of the debtor, which is 1000 International Drive.  On each note, Nilesh
inserted a comma after 1000, as is common in India, and failed to capitalize
the word "drive".

It is totally implausible to believe that these identical errors were
committed by Nilesh each time he inputted the data manually, albeit
sometimes years apart.  He attempted to explain these errors by testifying that
he would often take out the hard copy of a note that he had previously
prepared and use it to guide his preparation of the new promissory note.  But
that explanation does not explain how each error was repeated in exactly the
same way.

The second group of promissory notes is not consistent with the template
from which each note were ostensibly prepared,[30] but is consistent with each
other.  These notes include the promissory notes given to Rajesh Patel,[31]
Rankah Patel,[32] Tushar Patel,[33] Mehul Patel[34] and Mayank Patel.[35]  The

---

[27]      Exh. 23 (April 1, 2011 note) and Exh. 26 (May 9, 2011 note).
[28]      Exh. 31.
[29]      Exh. 33.
[30]      Exh. 165.
[31]      Exh. 7.
[32]      Exh. 9.
[33]      Exh. 10 and Exh. 11.

inconsistency of each of these notes with the template is the same, and is twofold.  In each of the notes, there is a large blank space of several lines between the last two paragraphs of the first page, which does not appear on the template.  The space may be explained by the fact that it coincides with the page break between the first and second pages of the template.  Nevertheless, the identical spacing in each of the challenged notes is suspect.  As well, while both the template and the challenged notes are typed in full justification, after the first paragraph, which understandably varies from the template because blanks are filled in, the end of each line in the template does not correspond with the same words in each of the challenged notes, but those notes are all identical in this regard.

The third group of promissory notes is also essentially identical to each other.  These notes include promissory notes given to Rajesh Patel,[36] Prakash Patel,[37] Shiv Sanwal,[38] Palash Gupta[39] and Rambhai Patel.[40]  The template upon which they are based was altered to remove the quarterly interest-only payment amount and the schedule of payments from the first paragraph.  Two sentences are substituted for the third paragraph, as follows:

> Interest on the outstanding principal and all other charges and fees as outlined herein shall accrue, from the date hereof, at a rate of ten (10%) percent per annum until paid in full.

---

[34]   Exh. 12.
[35]   Exh. 14.
[36]   Exh. 8.
[37]   Exh. 19.
[38]   Exh. 21.
[39]   Exh. 32.
[40]   Exh. 35.

> In the event all or any part of the indebtedness evidenced by this note is collected by or through an attorney-at-law, all costs of collection, including reasonable attorney's fees, shall be paid by Maker.

The phrase "from the date hereof" appears in bold on every note. Again, the prospect that these changes, allegedly made manually, were made identically in every instance is not plausible.

Anil testified that in some cases, he sent drafts of proposed promissory notes to claimants so that the drafts could be reviewed. If changes were requested, the form would have to be completed "from the start".[41] This procedure makes no sense.

Nilesh acknowledged that he knows how to save documents electronically on the computer, by simply pressing the "save" button. He also acknowledged that it would have been significantly more efficient to save each document, avoid the need to access the CD in Anil's desk each time a promissory note was needed, and to make changes only as necessary. No reasonable explanation was offered to support this testimony that the practice of the office was not to save copies of the promissory notes electronically after they were drafted, but only to save a printed hard copy. The only conclusion to be drawn is that Nilesh's testimony that no drafts of the promissory notes were retained electronically cannot be believed. We can only speculate about why this

---

[41]   T41-10 (4/9/14).

testimony was offered.  Perhaps if the copies of the notes were actually saved

electronically, the metadata might refute the information on the notes about

when each note was prepared.  But such speculation is simply that and carries

no weight here.

What is the import of the conclusion that most of the promissory notes

may have been retained electronically?  The lack of credibility in the testimony

regarding the preparation of the promissory notes causes me to determine that

I cannot rely on those notes to substantiate the challenged claims.  That does

not mean that each claim based on the promissory notes must be invalidated.

A claim based on a loan need not necessarily be evidenced by a writing, e.g., a

promissory note.  The circumstances of each claim must be assessed to

determine whether the claimant has otherwise established the validity of his or

her claim by a preponderance of the evidence, even without a writing to

evidence the claim.

B.    <u>Debt or Equity – Recharacterization</u>.

To defeat each of the claims challenged, VWI contends that each infusion

of cash directed to the debtor or to the principals was really an equity

contribution rather than a loan, and must be recharacterized as such.

24

Distinguishing an equity contribution from a true loan can often be difficult, because the instrument in question may include characteristics of both debt and equity.  Brazoria County Stewart Food Markets v. C.I.R., 48 Fed.Appx. 917, *2 (5th Cir. 2002).  The intent of the parties may be shrouded by the circumstances of the case or the actual transaction itself.  To facilitate this analysis, courts have developed various multi-factor tests to help determine whether a particular investment should be treated as a capital contribution or as debt.  Most courts commonly utilize a thirteen factor test, or some variation thereof, and consider:

(1) the label used on the investment instrument;

(2) the existence or absence of a fixed maturity date;

(3) the source of the payments to be made under the instrument;

(4) the holder's right to enforce the payment of principal and interest;

(5) whether the contributing party received a right to participate in management as a result;

(6) the extent to which the claims were subordinated;

(7) the intent evidenced by the parties;

(8) the degree of capitalization;

(9) the identity of interest between the creditor and the shareholder;

(10) the source of payment for the interest;

(11) the company's ability to otherwise obtain loans from outside lending institutions;

(12) the extent to which the monies provided were used to acquire capital assets; and

(13) whether the company failed to repay on the due date.

See, e.g., Ellinger v. U.S., 470 F.3d 1325, 1333-34 (11th Cir. 2006); In re Official Committee Of Unsecured Creditors for Dornier Aviation (North America), Inc., 453 F.3d 225, 233 (4th Cir. 2006) (using a slightly condensed 11 factor test); Indmar Products Co., Inc. v. C.I.R., 444 F.3d 771, 777 (6th Cir. 2006) (same); In re Hedged-Investments Associates, Inc., 380 F.3d 1292, 1298 (10th Cir. 2004); Brazoria County Stewart Food Markets v. C.I.R., 48 Fed.Appx. 917, *2 (5th Cir. 2002).  The purpose of these types of tests is to "'distinguish true debt from camouflaged equity' by determining whether certain facts are more supportive of a loan or an equity transaction."  In re Alternate Fuels, Inc., 507 B.R. 324, 334 (10th Cir. BAP 2014).  The weight given to a particular factor usually depends upon the facts of the case.

The Third Circuit weighed in on the debt/equity dichotomy in In re SubMicron Systems Corp., 432 F.3d 448 (3d Cir. 2006).  While acknowledging the existence of the various multi-factor tests and agreeing that they "undoubtedly include pertinent factors", the court explained that the tests could be synthesized into one "overarching inquiry," explaining that:

> the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.  Answers lie in facts that confer context case-by-case.

Id. at 456.  See also Machne Menachem, Inc. v. Spritzer, 456 Fed.Appx. 163,

165 (3d Cir. 2012) ("Although the label given to a transaction by a party is a

factor, it does not outweigh what the parties actually intended or how they

acted."); In re Daewoo Motor America, Inc., 471 B.R. 721, 733 (C.D.Cal. 2012)

(the focus is on the "parties' intent at the time of the relevant transactions"); In

re Shubh Hotels Pittsburgh, LLC, 476 B.R. 181, 187 (Bankr. W.D.Pa. 2012)

("Whether a party intended a transfer of funds to constitute a loan or equity

contribution may be inferred from the party's actions, the text of its contracts,

and 'the economic reality of the surrounding circumstances.'").


     The court concluded that regardless of which test was used, in the end:

> No mechanistic scorecard suffices.  And none should, for Kabuki
> outcomes elude difficult fact patterns.  While some cases are easy
> (e.g., a document titled a "Note" calling for payments of sums
> certain at fixed intervals with market-rate interest and these
> obligations are secured and are partly performed, versus a
> document issued as a certificate indicating a proportional interest
> in the enterprise to which the certificate relates), others are hard
> (such as a "Note" with conventional repayment terms yet reflecting
> an amount proportional to prior equity interests and whose
> payment terms are ignored).  Which course a court discerns is
> typically a commonsense conclusion that the party infusing funds
> does so as a banker (the party expects to be repaid with interest no
> matter the borrower's fortunes; therefore, the funds are debt) or as
> an investor (the funds infused are repaid based on the borrower's
> fortunes; hence, they are equity).  Form is no doubt a factor, but in
> the end it is no more than an indicator of what the parties actually
> intended and acted on.

Id.  In SubMicron, the Court of Appeals affirmed the conclusion of the District

Court that the transaction at issue was actually debt rather than equity.  The

District Court noted that the funding was designated as debt by the parties, it had a fixed maturity date and interest rate, it was recorded as a secured debt on SEC filing and financing statements, and it was consistent with a loan to support the debtor's undercapitalized position.  Id. at 457.  The corporation's undercapitalization, the lender's participation on the corporate board and even the lack of physical notes was not enough to tip the scale toward an equity contribution.

Because the focus in determining whether a particular contribution is debt or equity is on what the parties actually intended and acted on in each case, we must address each individual claim on its own merits, and will do so below.  Nevertheless, there are some generalizations we can make regarding this group of alleged note holders.  We have determined that most of the promissory notes presented in support of those contributions are suspect, and may not be considered as support for the proposition that the claims are debts, even though the notes contain typical attributes of debt such as fixed maturity dates and default provisions.

Several aspects of the challenged claims suggest that the transactions were capital contributions rather than debt.  First, we observe that no regular payment of principal or interest was made to these claimants. Nor is there any evidence that any formal demand for payment was made by any of these

claimants.  The manner in which the interest rate was to be paid or deferred is also significant.

> When a transaction is intended as equity, there is usually no interest paid or interest payments are sporadic because the investor is more interested in seeing the value of its investment grow rather than receiving periodic payments.  In reviewing this factor, therefore, the Court considers whether the transaction is structured as debt (with periodic repayment of interest at least) rather than equity (where repayment is deferred).

In re Moll Industries, Inc., 454 B.R. 574, 582 (Bankr. D.Del. 2011).  Here, in every case, repayment of both principal and interest to each of the claimants was deferred.

Of additional significance is the fact that most of the advances of these claimants was recorded in the books of Am Star as Am Star equity, until the debtor's books were altered post-petition in October 2013, to reflect these claims as liabilities of the debtor.  Most of the money was contributed directly into an Am Star bank account.  Monies that were deposited into the debtor's bank account were immediately redeposited into an Am Star account.

In support of the recharacterization of the claims at issue as equity contributions, VWI offered the expert testimony of Joel Ross, an investment banker with significant experience in the hotel industry.  Mr. Ross opined that the claims at issue should be characterized as equity based on many of the circumstances presented in each case.  According to Mr. Ross, if the claimants held debt, the money would have been directed to the borrower rather than to

Am Star, a third party.  There would have been more clear-cut provisions

regarding maturity, schedule of interest payments, and default, cure and notice

provisions.  There would have been express consent from the senior lender,

and financial statements submitted to the claimants on a regular basis.

However, if the notes were all considered to be debt, the debtor would have had

nominal equity, would have been too thinly capitalized, and would probably not

have been able to consummate the loan with Roma Bank.


    The weight to be afforded to Mr. Ross' opinion that the challenged

claimants held equity rather than debt was lessened by his erroneous rejection

of the basic proposition that in a bankruptcy case, holders of debt are in a

better position than holders of equity.  Mr. Ross opined that in light of the dire

financial straits of the debtor throughout its existence, the claimants had no

basis to believe that they would get paid as lenders.  This opinion does not

support the conclusion that the claimants intended to make equity

contributions instead of loans, since holders of equity are less likely to get paid

than holders of debt if an entity liquidates.


    As noted, resolution of the issue of recharacterization must await review

of each claim, which follows.  Because of the apparently informal and

commingled relationship between the debtor, Northstar ITCA and Am Star, it is

difficult to know with any certainty what the contributions were used for and to

whose benefit they inured.  If we accept that these notes are reflective of debt

incurred by the debtor, then we understand that the debtor was very thinly

capitalized.  These factors suggest that the contributions made by the

claimants should be recharacterized as equity.  But these factors must be

supplemented by a review of the circumstances of each transaction.


      C.    <u>Individual Claims</u>.


      By VWI's successful attack on the integrity of most of the promissory

notes, and the legitimate questions raised regarding the characterization of the

claimants' contributions as debt or equity, the objector has produced sufficient

evidence to negate the prima facie validity of the challenged claims.  The

burden shifts back to each claimant to establish the validity of the claim by a

preponderance of the evidence.  To establish the validity of the claim, each

claimant must show that their contribution was truly a loan, and that the loan

was made to the debtor rather than to the individual principals or to Am Star.


      While the principals of the debtor, Anil and Manish, testified that each

transaction was intended by both parties to be a loan to the debtor, the import

of their testimony in this regard is weakened by the fact that they chose to

record most of the advances as equity in Am Star.  Most of the cash was

deposited into the Am Star account.  If cash was deposited in the debtor's

account, it was immediately redirected to Am Star, and comingled with the

funds of all of the Northstar Group entities.  The irregularities described with

the promissory notes noted above, and the alteration of the debtor's books to reflect the challenged claims as liabilities of the debtor, after the bankruptcy filing, are also of serious concern.  Such a wholesale adjustment of the debtor's books, entered in some cases years after the original transaction, and thirteen months after the bankruptcy filing, is highly irregular.  While closely held businesses are often operated informally, with understandable gaps in accounting practices, this debtor is a part of a sophisticated business organization operated by skilled and experienced principals.[42]  The irregularities noted cannot be explained in this context simply as gaps in accounting practices.

Notwithstanding these concerns, if a claimant clearly demonstrates that he or she intended to loan money rather than to make an equity contribution, and that the advance was specifically made to the debtor, then the claimant will be successful in establishing the validity of his or her claim.  When an individual lends money, the grantee does not escape liability for that obligation if the grantee does not record the obligation properly on its books, or uses the money for purposes that were not intended by the grantor.  The question of whether an advance should be characterized as debt or equity arises when the grantor's intent in advancing the fund is not clear on the record.  The

---

[42]     Anil has a BA Degree in finance, was a bank examiner for the FDIC, and engaged in commercial mortgage lending for a bank.  He has been a partial or full owner of 30 hotels, and touts his success in turning around distressed properties and selling them at a handsome profit.

circumstances surrounding the transaction must then be evaluated to designate the claim as debt or equity.

We embark on a review of each of the challenged claims.

1.    <u>Pravin Modi</u>.

Pravin Modi filed a proof of claim in the amount of $70,616.57 on October 7, 2013, including two different promissory notes, each in the amount of $50,000, and each dated February 6, 2009.[43]  The first promissory note is between Pravin Modi and Anil and Manish Patel.  The second note, also dated February 6, 2009, is between Pravin Modi and Mount Olive.  The second note contains the errors described above for some of the notes, including that the loan is for "Mt. Olive HOSPITALITY, LLC", which is located at 1000, International drive, Budd Lake, NJ."  Attached to the proof of claim was also a copy of a personal check written by Pravin Modi to Am Star dated February 2, 2009 in the amount of $50,000.  In the memo space, it states "Investment".

Pravin Modi was a friend of Anil's father Rambhai Patel, and he knew Anil socially before advancing money to him or his projects.[44]  He had heard about Anil's success in the hospitality field and felt confident that his loan

---

[43]    Proof of Claim #12.
[44]    Exh. 151, Pravin Modi Depos. T19 to 20 (10/21/13).

would be paid back.[45]  He did not obtain any financial information prior to
making the loan.[46]  He understood that the money would be used to make
improvements at the newly purchased hotel.[47]

Most remarkably, Pravin testified at his deposition that the only note he
had in the folder that he maintained on this loan was the note given by Anil
and Manish individually,[48] and that he had not seen the note with the debtor
as obligor until the date of the deposition.[49]  He explained that Anil counseled
him against investing in the hotel because he was retired, but that Anil was
willing to accept a loan.[50]  When questioned about the two different versions of
the notes, Pravin testified that he understood that he was lending the money to
Anil.[51]  Pravin was equivocal about who would pay him back.  He first testified
that it would be "Mount Olive Hospitality or Wyndham Hotel,"[52] and then
explained that "[a]s soon as Anil Patel sign (sic) this, and he is the Wyndham
Hotel so he will pay us – he will pay me money back."[53]  He wrote his check to
Am Star as directed by Anil.[54]  He explained that he wrote the word
"investment" on the check meant "investing in [Anil's] business as a loan."[55]

---

[45]    Id. at T24-3 to 5.
[46]    Id. at T21-22 to 24.
[47]    Id. at T43-11 to 19.
[48]    Id. at T30-11 to 14.
[49]    Id. at T35-17 to 19.
[50]    Id. at T14-18 to 21.
[51]    "I'm giving a loan to Anil Patel, and he is in charge of this whole business."  Id. at T32-6
to 7.
[52]    Id. at T32-21 to 22.
[53]    Id. at T33-11 to 13.
[54]    Id. at T15-8 to 10.
[55]    Id. at T45-3 to 6.  He added:  "It's never thought about, you know, like it's a loan, and I
might – I just put the investment, but meaning was – it was a loan."  Id. at T45-20 to 23.

Even though the note says that it was a one year loan, he was under the impression that he would continue to receive interest if they did not return his principal even after one year.[56]  He believed that the loan was accruing interest since it was not being paid.[57]  Although he preferred to receive his expected $5,000 in interest each year, he was content to defer those payments.[58]

While Pravin Modi understood that the purpose of the loan was to make improvements to the debtor's hotel property, his equivocation about who he was loaning money to, coupled with the fact that he directed his check to Am Star, defeats his claim that he loaned money to the debtor.  Contributing to this conclusion is the fact that he testified that he only had the note given by Anil and Manish individually in his personal record of the loan.  Mr. Modi has failed to meet his burden to establish the validity of his claim by a preponderance of the evidence.

The objection to the claim of Pravin Modi is sustained.

2.    <u>Amit Shah</u>.

---

[56]    <u>Id</u>. at T39-8 to 11.
[57]    <u>Id</u>. at T40-22 to 24.
[58]    <u>Id</u>. at T42-11 to 15.

Amit Shah did not testify by deposition or in court.  He was listed in the debtor's schedules with a claim of $175,611.24.[59]  A promissory note in the amount of $125,000, dated April 20, 2009, was presented in support of this claim.[60]  This note included the capitalization and comma errors outlined above.

Amit Shah submitted a certification stating that "without knowing exactly where the funds were to go", he obtained a bank check in the amount of $125,000 payable to Anil Patel.[61]  The record reflects a deposit of $125,000 was made on April 20, 2009 into Am Star's account.

There is no credible support in this record for the proposition that Amit Shah advanced funds to the debtor.  The promissory note is suspect.  His check was made out to Anil, and was deposited into Am Star's account.

The objection to the claim of Amit Shah is sustained.

3.    <u>Gungor James Deringor</u>.

---

[59]    VWI Obj. to Claim (Dkt. #134).
[60]    Exh. 18.
[61]    Amit Shah Certif. (Dkt. #163).

Mr. Deringor is also known as Jim Gungor.  He filed a proof of claim on October 10, 2013 in the amount of $220,177.69.[62]  He provided copies of two promissory notes in support of his claim.  The first promissory note in the amount of $100,000 was dated April 1, 2011, and contained the same capitalization and comma errors as has been described above.[63]  Mr. Gungor issued a check in the amount of $100,000 to Anil Patel, individually, dated April 12, 2011.  The Am Star account shows a deposit of $100,000 on April 13, 2011 that it is attributed to Jim Gungor.

The second promissory note was identical to the first, with the same errors, except it was dated May 9, 2011.[64]  Again a check was issued by Mr. Gungor payable to Anil Patel in the amount of $100,000, which was deposited into the Am Star account.

Mr. Gungor testified in court that he approached Anil Patel about investing in the debtor.[65]  He had made previous loans to Anil and Manish individually in 2010.[66]  When he wrote the checks to Anil, he "had an idea that that was going to Mt. Olive Hospitality,"[67] but he knew little about the hotel and advanced funds on the basis of the trust he had in Anil and Manish.

---

[62]    Proof of Claim #13.
[63]    Exh. 23.
[64]    Exh. 26.
[65]    T141-14 to 18 (4/9/14).
[66]    Id. at T141-20 to 23.
[67]    Id. at T156-14 to 18.

A glaring problem with Mr. Gungor's claim that he advanced funds to the debtor is the fact that there are several corresponding promissory notes that were in the debtor's files, one of which was also in Mr. Gungor's possession, that are inconsistent with Mr. Gungor's testimony.  A promissory note dated April 11, 2011, naming the individual grantors as Anil and Manish, was in the debtor's file, as well as in Mr. Gungor's file.  Mr. Gungor opined that the corporate note probably replaced the individual note, but the dates of each note – April 1, 2011 for the corporate note and April 11, 2011 for the individual note – belie that assumption.  It appears that the individual note may have replaced the corporate note.  While Mr. Gungor testified that he received the original notes around the time the funds were advanced, he acknowledged that his wife received the mail and filed his paperwork, and that he didn't pay much attention to the contents of the notes.

Further indication that the loans from Mr. Gungor were actually made to the individuals, Anil and Manish, is suggested by a note dated April 1, 2013.[68] This note for $214,000 was given to Mr. Gungor by the individuals Anil and Manish, and appears to match up as a renewal of the two $100,000 advances made by Mr. Gungor in 2011, with 7% interest.[69]

---

[68]    Exh. 29.

[69]    The advance made by Mr. Gungor to the individuals Anil and Manish in 2010 was in the amount of $200,000.  At the rate of 7% interest, the renewal would not match up with that obligation.  See Exh. 22.

Mr. Gungor testified that the checks in question were written out to Anil rather than the debtor because "I told my wife that we were going to loan money to Anil and Manish, and would she please go to the credit union and get a check?  And she went and got a check, so I never looked at it, or instructed her otherwise."[70]  Mr. Gungor's explanation about the check does not dispel the questions raised about whether this advance was actually made to the debtor.

While Mr. Gungor "had an idea" that his advances would be for the debtor's benefit, that expression is not enough to overcome the question raised by the individual notes, the fact that the check was issued to Anil, and the fact that the money was deposited in Am Star. Mr. Gungor has not met his burden of proof by a preponderance of the evidence.[71]

The objection to the claim of Jim Gungor is sustained.

4.   <u>Palash Gupta</u>.

Palash Gupta filed a proof of claim on November 5, 2013 in the amount of $148,186.30.[72]  Attached to the proof of claim were copies of two promissory

---

[70]   T162-13 to 17 (4/9/14).

[71]   Mr. Gungor also answered affirmatively to his attorney's question:  "Nonetheless, sir, you lent the money to Mt. Olive, correct?"  T159-18 to 20 (4/09/14).  But the question was leading, and is therefore not particularly helpful to Mr. Gungor.

[72]   Proof of Claim #15.

notes, one for $40,000 dated 10/24/11,[73] and another for $100,000 dated

April 2, 2012.[74]  Both notes suffer from discrepancies.  The note for $40,000

contains the capitalization and comma errors discussed above.  The note for

$100,00 is nearly identical to a note made out to Prakash Patel dated two years

earlier, on April 1, 2010,[75] offering strong support for the proposition that the

Gupta note was copied from the Prakash note.  This would not be a problem

except for the fact that Nilesh, who prepared the notes, and Anil, who signed

them, both testified that electronic copies of the notes were not retained.


     The discrepancies with Mr. Gupta's notes are twofold.  First, the Gupta

note, while noting in numerals that the amount of the note is $100,000, spells

out "One Hundred Fifty Thousand Dollars".  The Prakash note spells out "Fifty

Thousand Dollars" in the same way.  It appears that the words "One Hundred"

were added to the note, while the word "Fifty" was not deleted.  The second

discrepancy is even more striking.  The Prakash note entitles the holder to

demand payment "at any time after January 1, 2011."[76]  The Gupta note,

ostensibly issued two years after the Prakash note, on April 2, 2012, has the

same opportunity offered to the holder, i.e., that the holder may demand

payment "at any time after January 1, 2011."  As noted earlier, the promissory

note is substantially discredited by these circumstances.

---

[73]     Exh. 31.
[74]     Exh. 32.
[75]     Exh. 19.
[76]     Id.

Nevertheless, Mr. Gupta testified credibly that he advanced money specifically to the debtor.  In prior transactions, Mr. Gupta had lent money to specific projects of the Northstar Group.  While he knew little about the debtor or its financial condition, and lent money to the debtor based on his trust of Anil and Manish, I believed his straightforward testimony that the money was lent to the debtor.

Mr. Gupta has met his burden of persuasion to support his claim.  The objection to the claim is overruled.

5.      <u>Jigar Patel, Inc</u>.

Jigar Patel, Inc. did not have a representative testify in court or by deposition.  Jigar filed a proof of claim on October 23, 2013 in the amount of $26,294.52.[77]  The note attached to the proof of claim, dated March 12, 2012, was in the amount of $25,000.  The note is plagued by the same capitalization and comma errors described above.  The proof of claim included a copy of a check (#171) in the amount of $150,000 payable to Am Star and dated March 10, 2012.  The memo section of the check notes the word "loan".  I assume from this record that most of the original advance was paid back.

---

[77]      Proof of Claim #14.

Jigar Patel, Inc. has failed to meet his burden of persuasion to establish the validity of its claim.  The objection to the claim is sustained.

6.    <u>Rajesh Patel</u>.

Rajesh Patel was listed on the debtor's schedules with a claim in the amount of $832,446.37.[78]  Two separate promissory notes are associated with the Rajesh Patel claim.  The first promissory note is in the amount of $400,000, dated January 1, 2008.  The $400,000 advance was made over two months prior to the date of the note, on or about October 27, 2007, and nearly two months before the debtor LLC was formed on December 17, 2007.  Dr. Patel understood that the money would be used to acquire the Mount Olive property.  He vaguely remembered that Anil and Manish "were looking into a property which they thought was good."[79]  I have not found in the record who the check from Dr. Patel was made out to, but the money was deposited into the Am Star account.  Only $10,000 of the money advanced by Dr. Patel was actually spent in connection with the acquisition of the property.  The Am Star bank account shows that by December 11, 2007, the account had been spent down to about $25,000.  The promissory note to Dr. Patel from the debtor was not prepared until January 1, 2008.  As with every other note, the obligation was not noted on the debtor's books until nearly six years later, after the bankruptcy filing.

---

[78]    VWI Obj. to Claim (Dkt. #230).
[79]    Exh. 148, Rajesh Patel Depos. T80-12 (1/1/13).

On this record, I cannot conclude that the validity of the $400,000 claim against the debtor has been established.  That Dr. Patel advanced the money is clear, but the identity of the grantor is not as certain.  When Dr. Patel made out the check, the debtor did not exist.  The notion that a liability can be transferred to a newly formed entity, with no recorded notation regarding that liability, is puzzling.

The second advance made by Dr. Patel, in the amount of $100,000 dated October 31, 2009,[80] is documented by a promissory note that is discredited, like most of the others, because it differs from the template but has identical features to other notes.  Dr. Patel has no memory about "how that [the loan] happened or how that came about,"[81] and no memory of whether the funds were paid to the debtor.[82]

Accordingly, I must conclude that Dr. Patel has not met his burden of establishing that either advance was a loan to the debtor.  The objection to his claim will be sustained.

7.      Tushar Patel.

---

[80]      Exh. 8.
[81]      Exh. 148, Rajesh Patel Depos. T85-25 (1/1/13).
[82]      Id. at T86-2 to 3.

Tushar Patel did not testify in person or by deposition.  He was listed in the debtor's schedules with a claim in the amount of $638,339.68.[83]  Two notes are associated with Tushar Patel's claim.  The first note is a promissory note dated January 3, 2008 in the amount of $250,000, which was advanced shortly before the Mount Olive property was acquired on January 18, 2008.  The advance was treated as equity, and became a portion of the $2.4 million equity infusion required by Roma Bank as a condition of their loan to the debtor.[84]  A wire transfer of $250,000 was made into the debtor's account in connection with this transaction on January 3, 2008.

Tushar filed a certification dated October 30, 2013 stating that he loaned $250,000 to Mount Olive sometime in January 2008 and that "[t]his was made as a loan and not an investment."[85]   Against this information, we know that Tushar's advance was designated on the debtor's books as equity.  Anil confirmed that designation in his testimony.[86]  Because the certification executed by Tushar is not technically a part of the record of this hearing, and the objector had no opportunity to cross-examine the declarant, I cannot rely on the certification to support Tushar's claim.  I must conclude that the burden of proof has not been satisfied to validate this claim as a loan.  The objection to this part of the claim is sustained.

---

[83]      VWI Obj. to Claim (Dkt. #235).
[84]      On December 31, 2008, the equity assigned to Tushar was adjusted, along with other entries, to become the equity of Anil, Manish, Nilesh Patwa and Amish.
[85]      Tushar Patel Certif. (Dkt. #283).
[86]      T24-20 through T25-3 (4/9/14).

A second promissory note from the debtor to Tushar is dated May 28, 2010, in the amount of $150,000.  A wire transfer deposit of $150,000 was made into the Am Star account on May 28, 2010.  Again, Tushar certified in his submission to the court that he understood that the loan was being made to the debtor, and not to Am Star.  However, I cannot rely on the certification.  The obligation was not noted on the debtor's books as a liability until three years later, after the filing.  I must conclude that Tushar has failed to establish by a preponderance of the evidence that the claim is valid.  The objection to the claim is sustained.

8.    Mehul Patel.

Mehul Patel was included in the debtor's schedules with a claim in the amount of $703,892.44.[87]  In support of this claim, a promissory note in the amount of $400,000, dated January 8, 2008, from the debtor as the maker, was produced.[88]  A wire transfer deposit of $400,000 was received into the debtor's account on January 8, 2008.  The transfer was recorded as equity.

When Mehul was deposed, in response to being asked who he loaned money to, he testified that he loaned money to "Mount Olive Hospitality, that's

---

[87]    VWI Obj. to Claim (Dkt. #234).
[88]    Exh. 12.

the note I have."[89]  When asked how he knew that he had made a loan to
Mount Olive Hospitality, he answered "[b]ecause that's the note I got."[90]  He did
not recall how he received the original promissory note, i.e., by mail or
otherwise, or when he received it.  In connection with this litigation, he located
the note in his file and sent it to Mihir Patel, the person who was assisting his
counsel with coordinating the representation of several of the claimants.
Mehul's counsel, Steven Neuner, Esquire, e-mailed Mehul a date-stamped copy
of the note, which he had in front of him when he testified.

Through various partnerships, Mehul had invested in other ventures
associated with Anil and Manish, including hotels in Ocean City, BWI, Saddle
Brook and Somerset.  On this transaction, he requested that the advance be
considered a loan rather than an equity investment, because the economy was
weak, he already had some equity in the hospitality industry and he wanted to
diversify his portfolio.[91]

That Mehul intended his advance to be a loan rather than an investment
was established by his testimony.  In light of this testimony, the fact that the
debtor failed to treat the advance as a loan until many years later does not
change its characterization.  His testimony about actually lending to the debtor
is somewhat less clear.  Nevertheless, I note that Mehul's advance was

---

[89]     Exh. 149, Mehul Patel Depos. T10-19 (11/04/13).
[90]     Id. at T10-22.
[91]     Exh. 149, Mehul Patel Depos. T59 to 60 (11/04/13).

deposited into the debtor's account.  His testimony, along with the record of deposit, is just enough to meet his burden to sustain the validity of his claim.

The objection to the claim of Mehul Patel is overruled.

9.    Kanan Patel.

Kanan Patel was listed on the debtor's schedules with a claim in the amount of $600,804.03.[92]  Kanan Patel is married to Pravir Patel, who held a less than 4% interest in the debtor in 2010-11.[93]  A promissory note in the amount of $375,000, dated January 29, 2008 was offered in support of her claim.[94]  Mount Olive was listed as the maker.  The advance of $374,999.33 was deposited into the Am Star account on January 29, 2008.

During her deposition, Kanan Patel testified that she and her husband "loaned the money on interest to Mt. Olive company."[95]  While her husband had invested in Mount Olive, he determined that the advance of $375,000 should be a loan in her name because it is sometimes deemed good luck in their culture to have an investment or loan in a female name.  Kanan did not

---

[92]    VWI Obj. to Claim (Dkt. #231).
[93]    Kanan Patel Certif. (Dkt. #264).
[94]    Exh. 13.
[95]    Exh. 150, Kanan Patel Depos. T30-9 to 10 (10/29/13).

know any details about the transaction but was emphatic that the advance was a loan, and that it was made to the "Mount Olive Hospitality Company."[96]

The claimant's clear and unequivocal statements regarding the nature of the advance as a loan, and the intended recipient of the advance – Mount Olive Hospitality – sufficiently establish the validity of the claim, notwithstanding the failure of the debtor to record the loan in its records until years later.

The objection to the claim of Kanan Patel is overruled.

10.    <u>Mayank Patel</u>.

Mayank Patel did not testify in court or by deposition.  He was listed in the debtor's schedules with a claim in the amount of $436,941.17.[97]  A promissory note in the amount of $250,000, dated January 31, 2008 from the debtor as maker, was offered in support of Mayank Patel's claim.[98]  The record reflects a wire transfer deposit of $250,000 into the Mount Olive account on January 31, 2008.  The advance was not noted as a loan on the debtor's books until nearly six year later, after the bankruptcy filing.  Ultimately, on December 31, 2008, the advance was converted to become the equity of Anil, Manish, Nilesh Patwa and Alpesh Patel.

---

[96]    <u>Id</u>. at T46-15.
[97]    VWI Obj. to Claim (Dkt. #238).
[98]    Exh. 14.

Because the promissory note has been discredited as a reliable

evidentiary basis to support this claim, there is really nothing else in the record

to support this claim against debtor.  The objection to the claim of Mayank

Patel is sustained.

11.    Prakash Patel.

Prakash Patel was included as a claimant on the debtor's amended

Schedule F with a claim in the amount of $62,342.47.[99]  A promissory note

dated April 1, 2010 in the amount of $50,000, with debtor as the maker, was

offered in support of Prakash Patel's claim.[100]  Prakash wire transferred the

money directly to the Roma Bank on account of Mount Olive Hospitality.

Prakash Patel testified that he advanced money to the debtor, at Anil's

request, and that he understood the advance was to be a loan.  The problem

with the testimony offered by Prakash is that his loan may have been repaid.

He testified at his earlier deposition, and earlier in his testimony, that he had

no other business transactions with Anil or Manish or their associated

companies besides the one loan to the debtor, except possibly some "smaller

things, but not any major transactions."[101]  Nevertheless, when he was

---

[99]    VWI Obj. to Claim (Dkt. #309).
[100]    Exh. 19.
[101]    T96-10 (4/28/14).

questioned about a payment he received from Am Star of $50,000 on March

31, 2012, he recalled that he had advanced that amount to Nilesh on a

temporary basis.  He recalled that he wrote out a check with no payee, received

no documentation for the loan, and did not know what the loan was for.  He

acknowledged that Nilesh had no ownership interest in Am Star, a company

owned equally by Anil and Manish, and could not explain why a loan to Nilesh

would be repaid by Am Star.  These circumstances cast doubt over the

credibility of Prakash's testimony that he was not repaid, and cause me to

conclude that Prakash has failed to meet his burden of establishing the validity

of his claim by a preponderance of the evidence.


The objection to Prakash's claim is sustained.


12.    <u>Shiv Sanwal</u>.


Shiv Sanwal did not testify by deposition or in court.  He was listed in

the debtor's amended Schedule F with a claim in the amount of

$133,069.03.[102]  A promissory note dated April 26, 2010 from the debtor as

maker in the amount of $450,000 was submitted in support of Shiv Sanwal's

claim.[103]  When the advance from Mr. Sanwal was made, the advance was

characterized as equity.

---

[102]    VWI Obj. to Claim (Dkt. #304).
[103]    Exh. 21.

The funds were initially recorded as an equity contribution of $500,000 on the debtor's 2010 tax return.[104]   Schedule M-2 (line 2 a) of the tax return shows a cash capital contribution for $500,000 during 2010.[105]   Shiv Sanwal's Schedule K-1 reflects the same capital contribution in 2010 and shows a 25% membership interest in the debtor in 2010.[106]   There is no Schedule K-1 for Shiv Sanwal for the years prior to 2010.[107]   The 25% increase in capital for Shiv Sanwal corresponds to a 25% reduction in capital for 2010 for Anil and Manish (each had 12.5% less capital at the end of the year than at the beginning).[108]   A post-petition accounting entry was made on October 25, 2013 to record a liability in the reduced principal amount only.   Accrued interest was never recorded in the debtor's accounting records.

It appears that the advance made by Shiv Sanwal was paid down in principal to $30,000 in 2012.   Shiv Sanwal's equity in the debtor was eliminated in 2012 as a result of these payments.[109]   There is no Schedule K-1 for Shiv Sanwal on the debtor's 2012 tax return even though his 2011 Schedule K-1 shows that he owned a 25% interest in the debtor at the end of 2011.   The debtor's 2012 return shows an increase in the equity held by Anil and Manish that equal the equity formerly held by Shiv Sanwel.   Anil and

---

[104]    Exh. 43.
[105]    Exh. 43.
[106]    Exh. 43.
[107]    Exhibits 40, 41, 42.
[108]    Exh. 43.
[109]    Exh. MO-1.

Manish's 2011 Schedule K-1 shows that they each owned 25% at the end of
2011; their 2012 Schedule K-1 showed that they each owned 37.5%.

Given the fact that the promissory note to Shiv Sanwal was discredited,
and this advance was clearly designated as an equity contribution on the
debtor's books, I must conclude that the claimant has not met his burden to
establish the validity of his claim as a loan.  The objection to this claim is
sustained.

13.    <u>Rambhai Patel</u>.

Rambhai Patel is the father of Anil Patel and it is acknowledged by the
parties that he is a statutory insider of the debtor.  He did not testify in person
or by deposition.  He has a claim for $286,290.41[110] attributed to two
promissory notes:  June 28, 2012 in the amount of $280,000,[111] and
September 12, 2012 in the amount of $51,045.[112]

Neither the debtor nor Am Star directly received any of the funds
attributed to the $280,000 promissory note.[113]  Instead, the funds were wired
for the benefit of Shiv Sanwal, whose $450,000 advance was paid down.[114]  The

---

[110]    Amended Schedule F.
[111]    Exh. 35.
[112]    Exh. 36.
[113]    Exh. 59, 61.
[114]    Exh. MO-3.

advance of $51,045 note was paid to Calzeretto and Bernstein to fund the

debtor's filing fee in this bankruptcy case and the retainer for the firm.


Neither note was recorded in the debtor's accounting records prior to the

petition date.  A post-petition accounting entry was made on October 25, 2013

to record the principal amount only.  Accrued interest was never recorded in

the debtor's accounting records.  Both transactions also occurred when the

debtor was in receivership.


To further evaluate the circumstances of this note, we note that around

June 2012, Anil was attempting to raise funds to repay Shiv Sanwal.  Prakash

Patel testified that he was approached by Anil to advance the money.  He

testified further that a promissory note dated June 27, 2012, notarized by

Diana Marie Cruz, Anil's longtime assistant, was prepared, with Prakash

named as the holder, and that he made out a check in the amount of $280,000

but asked Anil not to cash it until he could fund it.  At some later point, he

determined that he could not fund the check, a timeframe "more than a day"

from the time the check was delivered and the promissory note was executed.

But on the same date as the date on the notarized promissory note with

Prakash as the holder, another notarized promissory note to Rambhai in the

amount of $280,000 was executed.[115]

---

[115]    The credibility of Ms. Cruz regarding the notarization of each note in question here was
called into question by these circumstances.

Because the promissory note is suspect, because the debtor's books did not reflect the liability until the post-petition adjustment, and in the absence of any other evidentiary basis to sustain Rambhai's claim against the debtor, the objection to the claim of Rambhai Patel is sustained.

The second promissory note was in the amount of $51,045, dated September 12, 2012.[116]  This was not one of the notes that was discredited. Rambhai Patel produced a copy of a personal check (#1031) in the amount of $50,000 payable to Calzaretto & Bernstein LLC, dated September 12, 2012.[117] In the check memo section, it states "On Behalf of Mount Olive Hospitality Legal Fees for Bankruptcy."  This amount was deposited on September 13, 2012.

On this second claim of Rambhai Patel, I am able to conclude that there is a sufficient basis to validate the claim.  The objection to the claim is overruled.

II.    Insider Status.

Under Section 1129 of the Bankruptcy Code, a Chapter 11 plan may be confirmed only if at least one impaired class designated in the plan votes to accept the plan "without including any acceptance of the plan by an insider."

---

[116]    Exh. 36.
[117]    Rambhai Patel Certif. (Dkt. #176).

11 U.S.C. § 1129(a)(10). VWI challenges the opportunity of the named note

holders to vote as members of the unsecured class of creditors, claiming that

each of them may be designated as an insider.


Under section 101(31), a party may qualify as a statutory insider or as a

non-statutory insider. A statutory "insider" is defined under the Bankruptcy

Code to include a "relative of the debtor". 11 U.S.C. § 101(31)(a)(i). It is not

disputed that Rambhai Patel, as the father of Anil Patel, qualifies as a statutory

insider, and accordingly would not be eligible to vote in this case if it is

determined that he holds a valid claim.


A party may also qualify as a "non-statutory insider" of the debtor. In

defining the term "insider", 11 U.S.C. § 101(31) places the word "includes"

before a list of examples which signifies that the definition of "insider" was not

intended to be limiting or exclusive. See, e.g., In re U.S. Medical, Inc., 531

F.3d 1272, 1276 (10th Cir. 2008) (quoting language from In re Kunz, 489 F.3d

1072, 1078-79 (10th Cir. 2007)); In re Lull, No. 06-00898, 2009 WL 3853210,

*4 (Bankr. D.Haw. Nov. 17, 2009) ("Congress intended an 'expansive view of the

scope of the insider class, suggesting that the statutory definition is not

limiting and must be flexibly applied on a case-by-case basis.'"). In other

words, "'insider status may be based on a professional or business relationship

with the debtor, in addition to the Code's per se classifications, where such

relationship compels the conclusion that the individual or entity has a

relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of dealings between the parties.'" <u>In re AFI Holding, Inc.</u>, 530 F.3d 832, 849 (9th Cir. 2008) (quoting <u>In re Friedman</u>, 126 B.R. 63, 70 (9th Cir. BAP 1991)); <u>In re Kunz</u>, 489 F.3d at 1079 (quoting <u>In re Enterprise Acquisition Partners, Inc.</u>, 319 B.R. 626, 631 (9th Cir. BAP 2004)). <u>See also</u> <u>In re U.S. Medical, Inc.</u>, 531 F.3d at 1276 ("An 'insider' who does not fall within the plain language of 11 U.S.C. § 101(31) but rather falls within the second category is a 'non-statutory insider.'").

> Thus, for example, a general partner or a relative is an insider per se, without need for showing the specific nature of the relationship with the debtor in a particular case.  A person or entity not made an insider per se can still be treated as an insider on a showing that the person or entity in fact had a relationship with the debtor that was sufficiently close that the two were not dealing at arm's length.

<u>In re Kunz</u>, 489 F.3d at 1079.  The courts generally "conclude that it was the legislative intent that a person with a relationship designated in the statute be treated as an insider because of the high potential for control inherent in those relationships, and that other persons may be found to be insiders in particular cases, based on the specific facts." <u>Id</u>.  This is consistent with the legislative history which describes an insider as "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." H.R. Rep. No. 595, 95th Cong., 1st Sess. 312 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 25 (1978). <u>See</u> <u>In re Krehl</u>, 86 F.3d 737, 741-42 (7th Cir. 1996) (the legislative history supports consideration of "the closeness of the relationship between the parties

56

and [] whether any transactions between them were conducted at arm's length").

To determine whether the note holders in this case qualify as non-statutory insiders requires consideration of both the nature of the relationship between the parties and whether the transactions in question were conducted at arm's length.  See In re Lopresti, No. 03-48839, 2006 WL 2708605, *6 (Bankr. D.N.J. Sept. 20, 2006).  "In determining the closeness of the relationship, courts have found the essential question is 'the degree to which the transferee is able to exert control or influence over the debtor.'"  In re Hill, 342 B.R. 183, 199 (Bankr. D.N.J. 2006) (quoting In re Dupuis, 265 B.R. 878, 885 (Bankr. N.D.Ohio 2001)).  Although actual control does not have to be shown, In re Winstar Communs., Inc., 554 F.3d 382, 396 (3d Cir. 2009), there must be something more than "the mere existence of a friendship."  Lopresti, 2006 WL 2708605 at *7.  See also In re U.S. Medical, Inc., 531 F.3d at 1278 ("more than mere closeness is necessary for a court to hold that a creditor was a non-statutory insider of a debtor").  "The case law that has developed [] indicates that not every creditor-debtor relationship attended by a degree of personal interaction between the parties rises to the level of an insider relationship."  In re Friedman, 126 B.R. 63, 70 (9th Cir. BAP 1991).

> A common basis for these rulings was the perception that, while a creditor may be in a strong bargaining position in dealing with the debtor, so long as the parties transact their business at arm's length, such circumstances do not necessarily give rise to insider status even though there was some degree of personal

> relationship with the debtor.  It is unlikely that Congress intended
> that complex business relationships existing over a period of time,
> attended by some personal involvement but without control by the
> creditor over the debtor's business, would subject such creditor to
> insider status.

Id.  See also In re U.S. Medical, Inc., 531 F.3d at 1277-78 (quoting Friedman).

In Windstar Communications, Inc., supra, the Third Circuit reaffirmed
the elements necessary to establish non-statutory insider status.  The court
acknowledged that "actual control (or its close equivalent) is necessary for a
person or entity to constitute an insider under § 101(31)'s 'person in control'
language."  However, the court clarified "that it is not necessary that a
non-statutory insider have actual control; rather, the question 'is whether there
is a close relationship [between debtor and creditor] and . . . anything other
than closeness to suggest that any transactions were not conducted at arms
length.'" 554 F.3d at 396-97 (quoting In re U.S. Medical, Inc., 531 F.3d at
1277).  At least one court has suggested, however, that "[t]here should be no
hard and fast 'per se' rule requiring that 'any transaction [ ]' not at arm's length
(along with affinity), renders the creditor an insider for the challenged
transaction." In re Bayonne Medical Center, 429 B.R. 152, 183 (Bankr. D.N.J.
2010).  Moreover, the court determined that "the mere potential to deal at other
than arm's length . . . (along with affinity) [is not enough] to qualify a party for
nonstatutory insider status.  Id. at 184-85.

Here, VWI has certainly provided a basis to conclude that most, if not all,

of the claimants had a close relationship with the debtor.[118]  VWI contends that

the contributions of funds from each claimant were not arm's length

transactions, because only the promissory notes evidence the transactions, and

there was no due diligence conducted by the claimants prior to the funding.

No attorneys were involved, little or no negotiation of terms took place, there

was no evidence that drafts were exchanged, and there was a paucity of

information about the deal conveyed to each claimant.  The transactions were

based on the trust engendered by Anil and Manish among their friends and

business associates, occasioned from past dealings and from their solid

reputation in their business community.  VWI contends that both elements to

establish insider status here – a close relationship and a lack of arm's length

transaction – are present with respect to each claim, qualifying each claimant

as a nonstatutory insider.


While VWI correctly describes the close relationships involved, and the

lack of due diligence on the part of each claimant in connection with the

funding, "not every creditor-debtor relationship [or debtor-equity holder

relationship] attended by a degree of personal interaction between the parties

rises to the level of an insider relationship."  In re Friedman, 126 B.R. at 70.

On the issue of arm's length transaction, the Tenth Circuit, quoting Black's

Law Dictionary, defined an arm's length transaction as "[a] transaction in good

faith in the ordinary course of business by parties with independent interests

---

[118]    See Post-Trial Brief of VWI, at 55-57.

59

… [that] each acting in his or her own best interest, would carry out." <u>In re Medical, Inc.</u>, 531 F.3d at 1277 n.4.  In <u>Winstar</u>, the Third Circuit, citing to <u>U.S. Medical</u>, focused upon whether the alleged insider had the ability to coerce the debtor into transactions that were not in the debtor's best interest.  <u>Id</u>.  No such coercion is evident in the circumstances of this case.  These were simple transactions involving the advance of funds in exchange for either debt or equity.  Consideration in the amount of the debt or equity was given by each claimant, as any other arm's length participant would have done.  The fact that the claimants may have not used good judgment in offering funding, or did not perform due diligence in examining the transactions, does not require a designation of insider status.

I conclude that VWI's motion to designate the claimants listed as insiders must be denied.  Here, notwithstanding the close relationship between the claimants and the principals of the debtor, there is no evidentiary basis to establish that the transactions were not accomplished at arm's length.

III.   <u>Trade Payables</u>.

The debtor listed approximately $800,000 of pre-petition trade debt on its bankruptcy schedules.  None of the creditors listed on the schedules appeared on the debtor's books and records at the time of the filing.  Rather, the creditors appear on the books of Northstar ITCA, who collected all of the

debtor's revenue from the hotel and paid all operational expenses from that
revenue.

Over a year after the bankruptcy filing, on October 3, 2013, the trade
payables noted on Northstar ITCA's books were entered for the first time as
liabilities on the debtor's QuickBooks account.  The liabilities were not listed
separately, but were noted as a lump sum entry in the debtor's books.  No
information was included regarding names of individual creditors, invoice
numbers or the status of the accounts.  The effective date of the lump sum
trade payables entry was December 31, 2012, a date over three months after
the filing.  Yet the lump sum listed correlated with the trade payables listed on
the schedules, which is supposed to list trade payables due as of the filing
date, September 17, 2012.  Certain obligations, like the franchise fee owed to
IHG, are included as the debtor's obligation when, in fact, the liability is clearly
that of Northstar ITCA, the franchisee.  To balance the books, the debtor erased
the management fee owed to Northstar ITCA.

The debtor supports the proposition that it is the obligor of the trade
payables generated by Northstar ITCA on the theory that Northstar ITCA was
simply acting as the debtor's agent, and would not be responsible directly for
any obligations incurred.  The Management Agreement between the debtor and
Northstar ITCA provides in paragraph 6.3 as follows:

> All debts and liabilities to third party persons incurred by
> Manager acting within the authority limitations as set forth in this
> Agreement, in the course of its operation and management of the
> Hotel Property shall be the debts and liabilities of the Owner only,
> and Manager shall not be liable for any such debts or liabilities
> unless such debt or liability is incurred in violation of the
> limitations as set forth in Article IV.[119]

Notwithstanding this contractual provision, other provisions in the

Management Agreement and the Lease Agreement between the parties

effectively cancel paragraph 6.3 out.  First, in their recitals of the Management

Agreement, it is erroneously provided that the Holiday Inn franchise will be

held by the debtor.  In reality, the franchise, and its attendant obligations, is

held in the name of Northstar ITCA.  Second, the Management Agreement

provides in paragraph I that "Owner hereby appoints Manager as an

independent contractor to manage and operate the Hotel Property."[120]  The

status of agent is inconsistent with the status of independent contractor.

Third, the Lease Agreement between the parties specifies that Northstar ITCA,

the lessee, shall pay rent to the debtor at the rate of $1,200 per year, and "shall

pay . . .  all expenses relating to the Leased Premises."[121]

VWI seeks authority to challenge the trade payable claims, particularly

on the ground that to the extent the liabilities exist, they are liabilities of

Northstar ITCA rather than liabilities of the debtor.  The irregularities raised by

---

[119]    Exh. 94 at 9.
[120]    Id. at 1.
[121]    Exh. 93 at 4.

VWI regarding these claims provide ample support for authorizing VWI to pursue the challenge, especially in light of the debtor's demonstrated intent to support the claims. VWI's motion for authority to challenge the trade payables is granted.

## CONCLUSION

I have determined that VWI's challenge to the various claims included by the debtor in its schedules will be granted in part and denied in part. VWI has successfully rebutted the prima facie validity of the scheduled claims and shifted the burden to the individual claimants. Focusing on the individual circumstances of each claim, I have made the following determinations:

| Claimant | Amount | Objection |
|---|---|---|
| Pravin Modi | $  70,616.57 | Sustained |
| Amit Shah | $175,611.24 | Sustained |
| Gungor James Deringer | $220,177.69 | Sustained |
| Palash Gupta | $148,186.30 | Overruled |
| Jigar Patel, Inc. | $  26,294.52 | Sustained |
| Rajesh Patel | $832,446.37 | Sustained |
| Tushar Patel | $638,339.68 | Sustained |
| Mehul Patel | $703,892.44 | Overruled |
| Kanor Patel | $600,804.03 | Overruled |
| Mayank Patel | $436,941.17 | Sustained |
| Prakash Patel | $  62,342.47 | Sustained |
| Shiv Sanwal | $133,069.03 | Sustained |
| Rambhai Patel | $280,000.00 | Sustained |
|  | $  51,045.00 | Overruled |

I have also concluded that VWI Properties, LLC's motion to designate the challenged claimants as insiders is denied.  VWI's motion for authority to challenge the inclusion of the trade debt in the debtor's schedules will be granted.

An order is being entered in conformance to this opinion.

Dated:  May 16, 2014

JUDITH H. WIZMUR
U.S. BANKRUPTCY COURT